## Case No. 6,072.

### HARMANSON v. BAIN et al.

[1 Hughes, 188;[1] 15 N. B. R. 173.]

District Court, E. D. Virginia. Jan. 3, 1877.

JURISDICTION IN EQUITY—CONSTRUCTIVE FRAUD—TRANSFERS OF PROPERTY TO OBTAIN A PREFERENCE—NEGOTIABLE INSTRUMENTS — CONCLUSIVENESS OF DECREE IN BANKRUPTCY.

1. Equity has jurisdiction of a bill charging fraud, which, except in form and as to the forum is nothing more than an action of indebitatus assumpsit, even though the fraud charged is only the constructive fraud contemplated by section 5128 of the Revised Statutes of the United States. Section 35, Bankruptcy Act [of 1867 (14 Stat. 534)].

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

2. If, however, the allegations of such a bill be disproved, and the real gravamen be found from the evidence to have been transfers of property, charged to have been made in violation of section 5128 in favor of several persons not parties to the bill, in independent transactions, *held*, that the bill described in 1, cannot be treated as brought to set aside the said transfers, first, because it does not pray for such a thing in terms; second, because it has not made all the persons connected with them parties defendant; and third, because even if it had made them all parties, it would have been multifarious. *Held*, therefore, that the bill must be dismissed.

3. Where an incorporated society which had been a bank of discount, deposit, and circulation in Virginia, ceased its business in 1862 in consequence of public invasion, and in 1865, after publishing that it would make settlements as far as practicable by set-off, undertook no other business than the liquidation of its affairs, in which it was much hindered by stay laws in force until 1869, and where before completing its settlements, it was thrown into bankruptcy in June, 1872, *held*, that the question of its insolvency as against persons with whom it effected settlements within four months before the bankruptcy, should not be considered as if the society was a trader, merchant, or bank, but with reference simply to whether its liabilities could meet its assets, that being the basis on which all had dealt with it for seven years.

4. Transfers of property are not void under section 5128, where it is proved affirmatively that the persons who effected them with the debtor had no intention of obtaining a preference, or the debtor of giving it.

5. Where the deposits due from a society which for ten years had ceased business as a bank and ceased to receive deposits, and which for seven years had been in liquidation, have ceased to be deposits of money, and become mere debts, and a commodity bought and sold in the market like public stocks, and are not paid or payable in money and are only available by way of set-off in favor of debtors to the society, *held*, that papers in the form of checks on these deposits are not checks, because not representing money, not payable at sight, and too much limited in negotiability as to the persons having use for them, but are mere evidences of the assignment of choses in action in the form of deposits.

6. Persons who sell such papers in the form of checks are not responsible to the assignee in bankruptcy of the society owing the deposits, for the amounts stated in dollars on the face of the papers called checks.

7. Upon a bill in the district court to impeach a transaction charged to be void under section 5128, that court, sitting in equity, is not concluded by an order of adjudication, which it has made in involuntary bankruptcy, declaring the said transaction to have been an act of bankruptcy; for the reason, that the character of the court, the evidence, the parties to the proceeding, and the technical quality of the act itself, are different in the two proceedings.

In equity. The Portsmouth Saving Fund Society of Portsmouth, Virginia, was a bank of discount, deposit, and circulation, on a capital of $32,000, for a period of some twenty years anterior to 1862. It was compelled to close its doors in that year by the troubles of the country. Its cashier, George M. Bain, Sr., now dead, preserved its assets as best he could, with care and fidelity, during the period and until the close of the Civil War. The first meeting of the directors of

the society after that event was held on the 11th of August, 1865; but there does not seem to have been any definite official ascertainment of the condition of the society until July 3d, 1866, when a committee, which had been appointed for the purpose, reported its assets to be at par valuation, less an item of profit and loss, $226,700; and its liabilities, less its capital stock, including all notes of circulation outstanding, $220,532. At the resumption of its business in August, 1865, the assets of the society consisted chiefly of notes which had been discounted before 1862, and which had been lying overdue since that period. Its liabilities consisted chiefly of amounts due to depositors and to the holders of the notes of circulation; the amount of the former being $183,210.40, and the amount of the latter (if none of the notes were lost) being about $36,726.21. A stay law was in force in Virginia, which remained until January, 1869. The statutes of limitation were also in suspension, and there was no chance of making collections by suit. In this condition of things the society did not venture upon a resumption of its regular business; and its directors resolved to open the doors of the bank merely for the liquidation of its affairs. At their first meeting, held August 11th, 1865, they "ordered that the cashier receive the notes of the institution and checks for deposits in payment of any debts due to the institution, and that the cashier give notice that the persons indebted to the institution can pay or renew their notes as formerly." Thus resuming operations only for the purpose of liquidation, the business proceeded on that basis for about seven years, until the 12th of June, 1872. It had but one officer, George M. Bain, Sr., in its place of business, and part of his time was given to other affairs. Its directory met but very seldom after long intervals. No banking business was done. No business but that of liquidation went on during this period of seven years. Except from sales of real estate no cash seems to have been received by the society during this period of liquidation. Except possibly as to cash received from sales of real estate, no notes seem to have been discounted otherwise than in renewal or settlement of old notes representing debts which originated before 1862. No cash was paid to depositors or to holders of notes of circulation. Nor did these two classes of creditors expect payment in cash or demand it at the counter from the cashier of the society. When notes of circulation were presented to the society, I infer that they were credited as deposits. Interest was credited to the depositors regularly each six months during the period of liquidation.

By June 12th, 1872, notwithstanding the hindrances of the stay law, the affairs of the society had been liquidated to the extent of about $200,000. There was still due to the depositors at that date $84,840, and there had been paid and credited of interest to the de-

positors $77,476 since 1865. This large liquidation had been effected almost exclusively by the process of set-off. Persons indebted on notes to the society would purchase from depositors assignments of deposits in the amounts wanted by them. These assignments were made in the form of checks, and were called or miscalled checks. The society being in liquidation and its deposits and notes having become choses in action, and commodities bought and sold in market like public stock. Bain & Bro., bankers and brokers of Portsmouth, as well as others, from time to time, bought largely of the deposits, making their heaviest purchases at par prices, and smaller ones at prices ranging from one hundred cents down to eighty and sixty cents. A few small deposits seem to have been bought by them and others at thirty cents. The holders of the large deposits seem to have had more or less confidence in the solvency of the society, and held their claims at par. The holders of smaller deposits seem to have sold at prices less than par as their needs or convenience induced. These assignments of the deposits in the form of checks were never treated as negotiable paper by being presented to the society for payment, and protested for non-payment. In fact they could only be used by debtors to the society in setting off their debts. Among the deposits bought by Bain & Bro. were those of John Nash, amounting to $11,517; of the Old Dominion Lodge, amounting to $9,000; of W. D. Whidbee, amounting to $1,143; and of Nathaniel Owens, amounting to $2,125,— these particular deposits making a total of $23,785. They were purchased in the early part of 1870. The alleged object of Bain & Bro. in purchasing them was to settle with them by set-off certain notes due to the society, to wit: a note of Bain & Co., a mercantile firm, for $5,000; a note of George M. Bain, Jr., for $4,300; and two notes of R. T. K. Bain for $1,461 and $1,466 respectively. The makers of these notes, with one exception, were members of the banking house of Bain & Bro. The notes, for the settlement of which these deposits were purchased, fell due in August and September following the purchases, and were never renewed. The directors of the society after that time ordered suit on all notes not renewed; but those of the Bains were not sued upon. According to the testimony of two of the firm they were not sued upon because they were considered by the society and their firm as having been settled by the deposits purchased for the purpose. But no actual entries were made taking the subjects of this set-off off the books of the society until June 4th, 1872.

At a meeting of the directors, held on the 4th of June, 1872, the cashier informed them of a suit pending against it on which judgment might be expected, in July proximo. This statement brought the directors face to face with the question whether or not an assignment should be made for the protection of creditors other than the one who was suing for judgment; and a committee was appointed to examine into the affairs of the society, with instructions to report before the 12th instant, to which day the directors adjourned. The alleged object of the committee was to ascertain whether or not the society was solvent. At a meeting of the 12th of June, the majority of this committee reported the condition of the society (estimating each asset and liability at its supposed value or amount) to be as follows: assets, $72,679; liabilities, $105,502. The liabilities included old notes of circulation outstanding to the amount of $20,080, none of which (except for $27.50) have been proved in bankruptcy, and all of which have probably been lost. The committee estimated that not more than $5,000 of these notes would ever come in; and therefore computed the actual value of the assets of the society at $72,679, and the amount of liabilities at $90,500. The result disclosed by their report was that the society was insolvent. Before this report was made, that is to say, at times between the 12th of April and the 12th of June, 1872, Bain & Bro. had assigned deposits held by them in the society to the amount of $15,307, executing their assignments in the form of the "checks" which have already been referred to. Most of these were made to persons who purchased them with a view of making settlements with the society, of debts due on notes; and the principal one of them, for the amount of $14,449, dated on the 4th of June, 1872, was drawn for the purpose, as they allege, of clearing off from the books of the society, first the several notes due by persons of their name which have been mentioned, and also balances due on three notes of one Bilisoly for about $750, and a note of one Campbell for $240; these latter being due from persons wholly irresponsible, and voluntarily paid by Bain & Bro.

The particular assignments by Bain & Bro. of their deposits in the society to the amount of $15,307 to different persons, settled the following matters, which, as will be seen if computed. make up the aggregate of $15,307. This amount of money is the subject of the suit which is now before the court for decision.

| | |
|---|---:|
| A curtail and discount for H. Wilson $ | 18 94 |
| A note of one Westwood.......... | 29 27 |
| A curtail and discount for some one not remembered................. | 32 03 |
| A note of one Brownley........... | 10 26 |
| A curtail and discount for H. Wilson | 18 79 |
| A note of Bain & Bro. lying over since 1870, principal and interest.. | 5,518 33 |
| A note of George M. Bain, Jr., lying over since 1870, principal and interest ....................... | 4,562 30 |
| A note of R. T. K. Bain lying over since 1870, principal and interest.. | 1,615 87 |
| A note of R. T. K. Bain, lying over since 1870, principal and interest.. | 1,021 44 |
| A balance due on notes of J. A. Bilisoly. indorsed by J. A. Benson. lying over since 1870, principal and interest ...................... | 792 90 |

A note of J. B. Campbell, principal, protest, and interest, lying over since 1870.................... 388 41
A check given to take up sundry cash anterior memoranda held against Bain & Bro. by the cashier of said society ......................... 404 51
A check in favor of G. M. Bain, Jr.    5 52
A note of T. M. Grant............ 196 94
A deposit placed to the credit of Mary J. McRae, which is still there   50 00
A check in favor of one Brownley..   20 00
A check in favor of George L. Neville ......................... 20 89

The four larger of the notes just mentioned were the same which were referred to in a previous part of this statement, and amounted; principal and interest, to $13,317.-94.

On the same 4th of June the directors authorized a note of J. G. Holladay, for the sum of $3,000, to be credited by a check which Mr. Holladay presented for like amount drawn by George L. Neville, one of the depositors of the society. They also authorized one or two smaller transactions with other persons, of a similar character, on the same day. Similar transactions are shown by the books of account to have been had by the society within four months before the bankruptcy, on which no suits have been brought, to the amount of $8,207.59. [The time within which the assignee could bring suits expired in May, 1876.][2] At their meeting on the 12th of June the directors resolved that a deed of assignment should be made, and ordered that one should be executed. At the next, or a subsequent day, a deed had been prepared and executed by the president, but it was never expressly ratified by any order of the directors, or sealed with the seal of the society, the use of this latter for that purpose being refused by the cashier, George M. Bain, Sr., now deceased. On the 17th of June, 1872, James G. Bain, a creditor of the society, filed a petition in this court against it in involuntary bankruptcy, charging as an act of bankruptcy the transaction of the directors with J. G. Holladay, which has been mentioned. On the 25th of September, 1872, this creditor filed an amended petition, charging that the execution of the deed of assignment of the 12th of June was an act of bankruptcy. On the 8th day of November, 1872, after a hearing of the petition and amended petition, the then judge of this court made an order in the usual terms of form 58, Bump (9th Ed.) p. 937, adjudicating the society a bankrupt. From this order there was an appeal to the supervisory jurisdiction of the circuit court. On the 11th of October, 1873, the circuit court affirmed the order of the district court in an order reciting the transaction with J. G. Holladay as an act of bankruptcy. This order was suspended afterwards by that court on a petition for review, and a rehearing granted. But on the 9th of April, 1874,

[2] [From 15 N. B. R. 173.]

after the rehearing, that court made an order renewing its order of October, 1873. The usual proceedings in bankruptcy were accordingly afterwards had in this court, and L. Harmanson became assignee of the assets of this bankrupt. On the 26th July, 1875, the assignee filed his bill in this court against Bain & Bro., as a firm, for the recovery of $15,307, charged to have been paid to them by the society on their checks drawn within four months before the 17th June, 1872. The bill makes the proceedings and papers in bankruptcy part of the record, and, after sundry formal recitals and allegations, charges that the Portsmouth Saving Fund Society being insolvent and in contemplation of insolvency, within four months before the filing of the petition in bankruptcy, with a view to giving preferences to Bain & Bro., who then had a large claim against the society for deposits, made certain payments, aggregating $15,307, on certain several days, in certain several sums stated, on "checks" of the said Bain & Bro., who were the persons receiving the said payments and to be benefited by them, they having reasonable cause to believe the said society to be then insolvent, and knowing and having reasonable cause to believe that the said payments were made in fraud of the provisions of the bankruptcy act of the United States; and the bill further charges that the said payments are void, and that the plaintiff is entitled to recover of the said Bain & Bro. the said sum of $15,307. The bill makes no other person defendant than Bain & Bro. It prays that they may be required to pay to the plaintiff the said several sums of money, amounting to $15,307. There is no allegation in the bill that the "checks" sued upon were paid to Bain & Bro. in anything else than money. There is in the bill no description or mention of or allusion to the property which passed from the society in settlement of the "checks" of Bain & Bro. The answer denies that the society made to the defendants, or any of them the payments or any of them in the bill mentioned, and denies that the defendants or any of them received or were benefited by any such alleged payments. It admits that the "checks" spoken of were drawn and signed by the defendants, but denies that any payments were made to them on account of the said "checks." There was also a demurrer to the bill, the ground of demurrer being that, on the case stated by the bill, the plaintiff had full and complete remedy at law, and a court of chancery had no jurisdiction.

Scarburgh & Duffield and James E. Heath, for complainant.

W. W. Crump and W. W. Old, for defendants.

HUGHES, District Judge. I am to consider this bill, first, as to its technical character and sufficiency, and second, as to the merits of the case presented by it.

1. When the argument was heard on the demurrer, neither the court nor the counsel for either party to the cause knew the facts as they have been disclosed by the evidence since taken. The court was wholly ignorant of those facts. The case, considered on the demurrer, was that of checks drawn by a depositor on a bank charged to have been at the time insolvent, which checks the bill alleged to have been paid to the drawers of them, and to have been drawn and paid under circumstances of knowledge and collusion, which, by section 35 (5128) of the bankruptcy statute, made them void and fraudulent. The bill prayed that the drawers of the checks, Bain & Bro., who were charged to have received the benefit of the preferential payments, might be decreed to repay the money received by them on the checks. The bill was, except in form, nothing more nor less than an action of indebitatus assumpsit for money of the society had and received by the defendant, and the only question presented by the demurrer was, whether a bill of the sort would lie, where the only ground on which the equitable jurisdiction could be founded was confessedly the allegation of constructive fraud under the 35th section of the bankruptcy act, no actual fraud being pretended. If it had been a case of first impression, I should have unhesitatingly decided in favor of the demurrer, but the authorities were numerous in asserting that constructive fraud was sufficient per se to support the equitable jurisdiction, and I felt constrained to overrule the demurrer. But the evidence taken upon the issues joined in the bill and answer has most surprisingly changed the aspect of the case.

The bill is founded upon papers which it calls checks, and which it treats as representatives of money. But these papers were not checks except in form. A check is a draft for the payment of money drawn against deposits of money on a bank or a banker doing a banking business, payable at the instant of presentation in money, to any bearer, if made payable to bearer, or to any holder by order, if made payable to order. Its two essential qualities are, being a representative of money, and having mercantile or unlimited negotiability. It would be preposterous to pretend that the checks named in this bill were payable in money, or that there were any deposits of money to meet them. And they were not mercantile paper with unlimited negotiability payable to any holder, because very few could hold them, namely, the few who were debtors to the bank, and in position to avail of them in the way of set-off. Nor were these papers called checks representatives of cash money in any sense. Nor were they drawn against a bank, but only against a corporation, in slow, tedious liquidation, which had ceased to be a bank for ten years. They were but the mere evidences of assignment by their drawers of choses in action in the form of deposits, which deposits were not payable in money. The better opinion now obtaining is, that even a mercantile check on a vital bank, passes the title to its bearer by assignment, before presentation for payment and at the time of delivery; giving him the right to sue the bank for the money covered by the check from the time of his receiving it, though, in passing from hand to hand it might get back, before presentation for payment, to the drawer himself. See Morse, Banks, pp. 465–474, and the numerous cases there cited. Every check, therefore—every draft that is a check in fact as well as form—may now be considered as an assignment before presentation for payment; of course it is after presentation. Certainly it cannot be contended that a paper which is merely in the form of a check, not mercantile, narrowly limited in negotiability, not drawn on a bank or banker, not payable in money, has any other value than as the evidence of an assignment of a chose in action. The checks, therefore, so called by this bill, were but assignments. And I do not suppose that it will be pretended that a person who assigns, without guarantee, a chose in action which has become a commodity in the market, like public stocks, or government bonds, at its market value, the public and all parties to it knowing the condition of the commodity, becomes responsibile to any one for the face value of the chose in action sold. Yet that is the claim on which this bill is based, made of course when the counsel thought these were mercantile checks for money in fact.

The case, therefore, in the light of the evidence before me, presents an aspect wholly different from that which it presented at the hearing of the demurrer, and which the eminent counsel who drew the bill supposed that it wore. The Portsmouth Saving Fund Society, which was assumed by the bill to have been a bank of discount and deposit, doing business as such up to the time of the filing of the petition against it in bankruptcy, turns out to have long before suspended its regular business, and to have been doing nothing else than liquidating its old business for seven years before that event, by the process of set-off. The checks mentioned by the bill as drawn by the defendants, turn out not to have been checks, except in form; and to have never been received, held, or presented for payment as bankable, protestable, negotiable paper; but to have been in legal effect, in fact, and in the minds of the receivers of them, the holders of them, and the society against which they were drawn, nothing more than evidences of the assignment of claims against the society to those who received them, by those who drew them. The payments of money charged in the bill to have been made by the society to the defendants on these miscalled "checks," turn out to be wholly imaginary and theoretical; no cash having actually been paid in

consequence of them; the so-called checks having been used as mere vouchers to serve as the basis for various entries in the books of the society.

The theory and allegations of the bill have thus been wholly contradicted by the evidence. The probata have entirely refuted the allegata, and the suit considered as an action against Bain & Bro., for money of the society had and received by them, has failed and must fall. No money was paid by the society on the checks; none was received from the society by the defendants; nothing at all passed from the society to Bain & Bro., in their own right and for their own benefit, as charged by the bill; and, in their own right as a firm, they had no interest in any transaction of the society in and about the checks after they had passed from the defendants. Bain & Bro. simply held choses in action against the bank. For seven years these deposits had been an article of merchandise in Portsmouth. As such they were sold and assigned by Bain & Bro., by the instrumentality of checks, or orders, or bills of sale, as the usage authorized. And Bain & Bro. had the legal right to sell those choses in action in the market for what could be got, without any reference to the bankruptcy of the society whatever, up to and even after the filing of the petition in bankruptcy. The act of Bain & Bro. in selling their claims for the market price, up to the day of the petition, and in evidencing their sales by drawing checks and delivering them to the purchasers, was in itself legal, and could not of itself subject them to any liability for what the purchasers might do in their own subsequent negotiations with the society. Bain & Bro.'s transactions, as assignors of their own right, title, and interest in the deposits, ended with the drawing and delivery of the checks. In their own right they received nothing from the society. And therefore the bill cannot be sustained, assuming that it made no one defendant but the firm of Bain & Bro. But it so happens that the firm of Bain & Bro. was composed of several members, some of whom were identical with some of the men whose notes were taken up by them. George M. Bain, Jr., one of the members of Bain & Co., the note of which latter firm was taken up, was a partner of Bain & Bro. His individual note was also one of those taken up. R. T. K. Bain, whose two notes were taken up, was a partner. But David A. Bain, deceased member of the firm of Bain & Co., or his representative, was not a partner. And James G. Bain and Thomas A. Bain, no note of either of whom was taken up, were partners. Thus, neither all the Bains whose notes were taken up were partners in Bain & Bro., nor were the notes taken up notes of all members of the firm. Bain & Bro., therefore, the defendants in this bill, are not identical with those Bains who received benefit from the transactions which were made the subject of formal

entries in the books of the society on June 4th, 1872; and the allegation of the bill in that particular, also, is disproved. As to parties, therefore, I do not see how the bill can, by construction, be so enlarged in its scope as to be treated as a bill brought under section 35 for the property, or its value, transferred in violation of its provisions on the 4th June, 1872, that property being the notes held by the bank of Bain & Co., George M. Bain, R. T. K. Bain, and others, and delivered on that day by the society to Bain & Bro., as agents or trustees of the several makers. Generally the prayer for general relief in a bill has great aptitudes; but the India-rubber properties of the prayer for general relief in this bill are inadequate to give it such a scope. Nor does the difficulty stop here. The curtails and discounts made for H. Wilson, the Westwood note, the Brownley notes, the Bilisoly notes, and the Campbell note were part of the property transferred in like manner with the notes of the Bains; and these several persons who all received the benefit of the transfers are in no manner parties to the bill; nor is Mrs. Mary J. McRae. And even if they were parties, as they should be, if the bill were drawn to embrace the parties to all the checks, the payment of which is complained of in the bill, it would be hopelessly multifarious. Considered, therefore, with reference to the recovery authorized by section 35, the bill is incurably defective in respect to parties defendant, in failing to bring them before the court. As to subject-matter, the bill does not pray that the transfers of the notes and credits which have been described may be decreed to be void, and does not seek the recovery of this property or its value, either in its language, or its intendment, or in any possible construction that can be given to it. Even, therefore, if all the parties to the transfers of property which, or its value, the bill ought to have sought to recover back, had been brought before the court by the bill, and the bill had not become fatally multifarious thereby, still it would be defective in not praying in terms for the recovery of the property which was transferred; or, failing that, in not in terms alleging its value, and in terms praying the recovery of that value.

I have examined all the cases of suits founded upon the 35th section of the bankruptcy act, which have as yet been reported as decided by the supreme court of the United States; and with only two exceptions, in which there was plainly no necessity for its so being, the proceeding was by bill and brought in equity, because the bills all prayed the court set aside the transfers or payments they complained of as void, and it was necessary to make all the persons connected with the transactions, parties to the proceedings. These cases are: Toof v. Martin, 13 Wall. [80 U. S.] 41; Traders' Bank v. Campbell, 14 Wall. [81 U. S.] 87; Tiffany v.

Lucas, 15 Wall. [82 U. S.] 410; Buchanan v. Smith, 16 Wall. [83 U. S.] 277; Wager v. Hall, Id. 584; Allen v. Massey, 17 Wall. [84 U. S.] 352; Wilson v. City Bank, Id. 473; Bartholow v. Bean, 18 Wall. [85 U. S.] 635; Cook v. Tullis, Id. 332; Tiffany v. Boatman's Sav. Inst., Id. 376; Mays v. Fritton, 20 Wall. [87 U. S.] 414; Bayley v. Glover, 21 Wall. [88 U. S.] 342; Clark v. Islen, Id. 360; Michaels v. Post, Id. 398; Watkins v. Taylor, Id. 378; Burnhisel v. Firman, 22 Wall. [89 U. S.] 170; Amsinck v. Bean, Id. 395; Sawyer v. Turpin, 91 U. S. 114. One of the points decided in Smith v. Mason, 14 Wall. [81 U. S.] 419, is, that as strangers to a bankruptcy proceeding could not properly be affected by the summary process used in a bankruptcy court, and yet are necessary parties where it is sought to set aside transactions under the 35th section, in which they have participated, plenary proceedings must be brought for that purpose in the district or circuit court, or other court of terms. I am bound, therefore, in view of all these considerations, to hold that on the principles of pleading, and the law and evidence of this case, the bill is, in its form and scope, on the issue joined, fatally defective, and must be dismissed.

2. I think it proper, however, though technically unnecessary, to pass also upon the case presented, with reference to its merits. I shall suppose the case to stand upon the transactions represented by the check for $14,499, dated on the 4th of June, 1872, which was used to take up the four notes of several of the Bains, which have been mentioned, to pay off balances on three notes of Bilisoly, and to take up the note of J. B. Campbell. The taking up of these four last-named notes, which were debts of persons wholly irresponsible, and which were worth nothing to the society in strict right, and which were voluntarily paid by some one or more of the Bains, was an unqualified benefit to the society, cannot be complained of, could not have worked a preference as against the creditors of the society, and may as well be dismissed from consideration, and I do dismiss them. The notes of the Bains which they were allowed to take up in the same transaction, and which aggregated in principal and interest $13,317.94, were worth dollar for dollar; and the question on the merits of the case is, whether or not, under the circumstances under which they were taken up, the transaction was void under the provisions of the 35th section of the bankruptcy act (section 5128, Rev. St.).

I am confronted in the consideration of this question by the orders of the bankruptcy courts, adjudicating the Portsmouth Saving Fund Society a bankrupt, the order in bankruptcy of the circuit court having expressly recited the transaction of the society with J. G. Holladay as an act of bankruptcy, and that transaction having been had on the 4th of June, 1872, the same day on which the check of Bain & Bro., for $14,499, was used for taking up the notes which have been described. The bankruptcy courts, however, acted on a more or less technical view of the case, and on a very limited presentation of facts compared with the thorough development of them which now enlightens this court. The parties benefited by the transaction were not before the courts of bankruptcy. The case is now before a court of equity, which considers every transaction in the light of its merits more than its technical features, and which renders its decrees in accordance with the dictates of substantial equity and justice. No actual fraud is pretended. The case is confessedly one of constructive fraud, and is heard in a court that will not subordinate the ends of justice to merely technical considerations. I do not consider myself precluded, therefore, by the orders of the courts of bankruptcy referred to, from considering and deciding this case with respect to its merits and irrespectively of the orders which were made by those courts.

In order that the transfer of the notes of the Bains, which are under consideration, should be void under section 35 of the bankruptcy act (section 5128, Rev. St.), certain facts must coexist. (1) The society must have been insolvent within four months before the petition in bankruptcy was filed on 17th of June, 1872. (2) The transfer must have effected a preference, and have been made for the purpose of so doing. (3) The persons receiving benefit by the preference must have had reasonable cause to believe the insolvency of the society. (4) And also to know that the object of the transfer was to give them a preference. Toof v. Martin, 13 Wall. [80 U. S.] 40; Clark v. Islen, 21 Wall. [88 U. S.] 360; and Mays v. Fritton, 20 Wall. [87 U. S.] 414. I shall examine the case only with reference to the society's knowledge of its insolvency, and to the question whether the transaction of 4th June, 1872, was made for the purpose of securing a preference for the Bains. The other points are conceded.

The term "insolvency" is not always used in the same sense. It is sometimes employed to denote the insufficiency of the entire property and assets of an individual to pay his debts. This is its general and popular meaning. Toof v. Martin, 13 Wall. [80 U. S.] 40. This is the sense in which the term insolvency is used when applied to persons who are not traders, and are not engaged in mercantile, banking, and financial pursuits, carried on principally by the means of negotiable paper. As to persons engaged in pursuits carried on by the use of such instruments, the term insolvency means an inability to pay off or take up that sort of paper in the ordinary course of business. Now, this society of Portsmouth had long ceased to be engaged in the latter sort of business; and for seven years preceding the filing of the petition in bankruptcy against it, had been engaged in the sole business of liquidating its affairs. Whether it was insolvent, therefore,

was simply a question whether its assets could be so managed as to liquidate its debts. All persons had been dealing with it for seven years on that basis; and as against any of those persons it would be grossly unjust to treat the question of the society's insolvency upon any other basis of inquiry. The orders in the courts of bankruptcy against it were based on the belief of those courts that up to June 17th, 1872, it was a bank engaged in the business of banking, whose solvency was to be determined by the inquiry whether it was paying over its counter all obligations to depositors and note-holders as they were presented. The evidence which has now been taken in this cause shows that the courts of bankruptcy were misinformed on that head. The society had not been a bank carrying on the business of banking since 1862. Whether the society was insolvent, therefore, in the sense stated by the supreme court as above, was a question which must be admitted to have been undetermined up to the 12th June, 1872, when the committee, which eight days before had been appointed to look into its affairs, and to report with reference to this very question of doubt, made their report. It is the bankrupt who must know his insolvency. Up to that time it had been a mooted question, even among the officers and directors of the society, whether the corporation would be able to pay itself out of debt.

The committee which was commissioned to thoroughly investigate, inquire into, and report upon the question of insolvency, was appointed on the 4th June, 1872, the date of the transfer of the four notes of the Bains on the check of Bain & Bro., which is now under consideration, and, of course, had not then reported. The society, therefore, did not then know its insolvency; and the next and the vital inquiry is, whether the transaction of June 4th, 1872, was made for the purpose, on the part of the society, of giving a preference to those Bains who owed the notes. It is in evidence that the notes of the Bains had been considered as settled by the large deposits bought for the purpose, which had stood as an offset against them to the credit of Bain & Bro. since as early as the summer of 1870. These deposits had been bought and placed to their credit for the purpose, and the notes had been left with the cashier, who, being the father of its members, possessed the unqualified confidence of the firm, in pursuance of the standing resolution of the board which had been in force since 1865, and which had somewhat the effect of a contract of the society with its customers, "that the cashier should receive the notes of the institution and checks for deposits in payment of any debts due the institution." This resolution was general, had been acted upon by the society, and not ohly by the Bains, but by nearly all the debtors of the society, and was still in force on June 4th, 1872. Inasmuch, therefore, as the transaction had really been made in 1870, when no intention of

giving or procuring a preference could have been entertained, the motive existing at that time was the real motive of the transaction, and gives interpretation to what was done on June 4th, 1872, both as to the society and as to the Bains. It is also proved in evidence that the final entries which were made on the 4th of June, 1872, were made in consequence of the committee having been raised that day, and that they were made for the purpose, on the part of the cashier of the society, of placing the books of the society in a condition, cleared of all closed transactions, to show the real status of its affairs, so that the committee would have to consider only unsettled affairs affecting the question of its solvency or insolvency. Finally, the idea and motive of giving or securing a preference is negatived by the fact that part of the especial transaction under consideration was the voluntary settlement by Bain & Bro. of four debts due from Bilisoly and Campbell, aggregating about $1000, which were worthless to the society, and could never have been collected from the persons owing them, the gratuitous settlement of them showing that a preference was not in the mind or motive of Bain & Bro. or of the society.

The circumstances of the case all go to show the truth of the evidence I have mentioned. Instead of proving an intent to give or obtain a preference, the evidence really proves that no such an intent existed. The transaction simply conferred upon the Bains a privilege that had been conceded to and had been enjoyed by debtors owing obligations to the extent of $200,000 to the society. For the society to have refused to make the transaction would have been to give all of those debtors a preference over the Bains. The allowance of the transaction by the society, so far from giving the Bains a preference, was simply allowing them the same benefit that had been allowed others to ten or twenty times the amount. A recovery in this suit against Bain & Bro., after omitting to bring suits for other transactions of like character which were made within four months of the bankruptcy, to the amount of $8,207, would work a preference in favor of the persons benefited by these last-named transactions, and a discrimination against Bain & Bro., so that a suit brought to set aside a preference would itself, if successful, work a preference against these defendants of the very character which it seeks to condemn.

The evidence in the case proves that the intent and purpose of the transaction of the 4th June, 1872, was not to give or obtain a preference, but was other than that, and fair, honest, and legitimate on the part of the society and the defendants in this cause. The transaction had really been concluded, except in form, two years before, when no design of giving or obtaining a preference, in evasion of the bankruptcy law, could have been entertained, and it was had in pursuance of an

honest contract or understanding which the society had made with its customers, which its venerable cashier had uprightly fulfilled with all who complied with its terms, and which was in full force on 4th June, 1872. A court of equity will not, for the sake of making out a case of constructive fraud, disregard honest intentions, which are proved, and cast about ingeniously to find dishonest ones, which can only be inferred. I disdain such an office in this case and upon the merits decide that the bill must be dismissed.